UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 3 POINT DISTRIBUTION, LLC dba EZEKIEL, a California limited liability company,<br><br>    Plaintiff,<br><br>  v.<br><br>CAFEPRESS.COM, INC., a California corporation,<br><br>    Defendant.<br>_____ | CASE NO. SACV 07-0432 AG (ANx)<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |

  Before the Court is the Motion for Order Granting Preliminary Injunction ("Motion") filed by Plaintiff 3 Point Distribution, LLC ("Plaintiff"). Plaintiff claims that Defendant CafePress.com, Inc. ("Defendant") has infringed and diluted its trademark, and that Plaintiff will suffer irreparable harm unless Defendant is preliminarily enjoined from continued infringement. This Motion largely turns on the validity of Plaintiff's protectable interest in the claimed marks, and the viability of Defendant's fair use defense. After considering the parties' moving, opposition, and reply papers, and oral argument on the matter, the Court GRANTS Plaintiff's Motion.

## BACKGROUND

In 1992, Capital Distribution LLC ("Capital") began using the word "EZEKIEL" in connection with the sale of apparel products. (Declaration of Vincent De La Pena ("De La Pena Declaration") ¶ 2.) Vincent De La Pena, Capital's principal, applied for registration of the plain block letter EZEKIEL mark in connection with the sale of apparel. (Declaration of Raphael Gutierrez in Support of Defendant ("Gutierrez Declaration") Exh. D.) Registration of the plain EZEKIEL mark was granted by the United States Patent and Trademark Office ("PTO") in 1995, but was cancelled in 2002 for failure to submit evidence of continued use of the mark. Capital later used two stylized renditions of EZEKIEL in connection with the sale of apparel, and applied for registration of these marks with the PTO in 1998. (Plaintiff's Appendix of Exhibits ("Appendix") Exhs. A, B.) The two stylized renditions of the EZEKIEL logo were registered in 2000 and remain in effect. (Appendix Exhs. A, B.)

In 1999, Capital assigned its interest in the EZEKIEL mark to Azita Manufacturing, Inc. ("Azita"). (De La Pena Decl. at ¶ 7.) In June 2000, Plaintiff acquired all rights to the EZEKIEL marks from Azita. (Declaration of Steven Kurtzman ("Kurtzman Declaration") ¶ 2.) According to Plaintiff, since 1996 the EZEKIEL mark has been featured prominently on a wide range of apparel products sold by Plaintiff and its predecessors. (Motion 2:17-21.) Plaintiff claims that from 2002 to 2007 it invested approximately $9 million into the marketing of the EZEKIEL brand. (Kurtzman Decl. ¶¶ 6-7.) EZEKIEL brand products are sold nationwide in prominent retailers including Nordstrom and Macy's, as well as specialty retailers such as Pacific Sunwear and Zumiez. (*Id*. at ¶ 12.) By Plaintiff's count, EZEKIEL products are carried in "at least 338 retail stores" in California alone. (*Id*.)

Defendant describes itself as providing "a venue and capabilities for individuals, organizations and business to create, buy and sell customized merchandise online using the company's unique print-on-demand and e-commerce services." (Opposition to 3 Point's Motion for Preliminary Injunction ("Opposition") 3:20-22.) Through its website, users can upload designs and images and use them to customize over 100 blank products offered by Defendant,

including t-shirts, hats, and license plate holders.  These customized products are then available on Defendant's website either to the product's creator alone, or, if the product's creator wants to become a "shopkeeper," to the general public.  (Declaration of Candice Carr in Support of Opposition ("Carr Declaration") ¶ 5.)  "Once an order is placed, either by the shopkeeper or an individual who wants to purchase that shopkeeper's products, [Defendant] prints the shopkeeper-created image on the merchandise, and ships the product to the shopkeeper or his designated customer."  (*Id.*)

This action arises from Plaintiff's claim that Defendant is unlawfully using the EZEKIEL mark in connection with the sale of merchandise on its website, including apparel sold for prices comparable to those Plaintiff charges for its own products.  (Kurtzman Decl. ¶¶ 16-19.)  Plaintiff has provided printouts from pages on Defendant's website featuring t-shirts, sweatshirts, shorts, and other apparel that prominently feature the word "Ezekiel."  (Appendix Exhs. K-T.)  Plaintiff filed the complaint in this action on April 18, 2007.  Defendant claims that the parties engaged in settlement communications until Plaintiff stopped responding to Defendant's phone calls and emails in October 2007, and that Plaintiff made no further attempts to contact Defendant until after this Motion was filed on January 18, 2008.  (*Id.* at ¶¶ 5-9.)

**LEGAL STANDARD**

A preliminary injunction is a drastic and extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  A plaintiff may meet this burden by "demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in his favor."  *Dollar Rent A Car, Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1374-75 (9th Cir. 1985); *Prudential Real Estate Affiliates, Inc. v. PRR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000).  "These are not separate tests, but outer reaches of a single continuum."  *Dollar Rent A Car*, 774 F.2d at 1374-75 (quoting *Benda v. Grand Lodge of the Int'l Ass'n of Machinists &*

3

*Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978) (internal quotation marks omitted)).

However, in any situation the court must find that there is at least a fair chance of success on the merits, *see Johnson v. California State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995), and that there is some threat of an immediate irreparable injury. *See Big Country Foods, Inc. v. Board of Ed. Of the Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir. 1989).

**ANALYSIS**

**1.      LIKELIHOOD OF SUCCESS ON THE MERITS**

          Plaintiff contends that it is likely to succeed on the merits of its trademark infringement and trademark dilution claims.  Establishing a likelihood of success does not require Plaintiff to show that it will certainly prevail on the merits, but only that there is a reasonable probability that it will prevail.  *See Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991); *see also* William W. Schwarzer, A. Wallace Tashima, and James M. Wagstaffe, *Federal Civil Procedure Before Trial*, 13:48 (Rutter Group 2007).

**1.1      Trademark Infringement**

          Plaintiff claims that apparel products sold on Defendant's website infringe its EZEKIEL marks.  A successful trademark infringement claim under the Lanham Act requires a showing that the claimant holds a protectable mark and that the alleged infringer's imitating mark is similar enough to "cause confusion, or to cause mistake, or to deceive."  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004).  Plaintiff's burden to prove likely success on the merits includes a showing that it would likely prevail against any affirmative defenses raised by Defendant.  *See A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1015 n.3 (9th Cir. 2001); *see also Dr. Seuss Enterprises v. Penguin Book USA*, 924 F. Supp. 1559, 1562 (S.D. Cal. 1996).  Finding that Plaintiff is likely to prevail on each of these elements

and on Defendant's affirmative defenses, the Court concludes that Plaintiff is likely to succeed on the merits of its trademark infringement claim.

### 1.1.1   Evidence of a Protectable Mark

In a trademark infringement action, the purported trademark holder bears the ultimate burden of proof to establish the validity of the claimed mark. *Yellow Cab Co. v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005) (citing *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002)). Federal registration of a mark constitutes prima facie evidence of its validity. 15 U.S.C. § 1057(b). Registration thus serves as a burden shifting mechanism; if a mark is federally registered, it is entitled to a presumption of validity, and the burden of proving invalidity rests on the defendant. *Filipino Yellow Pages, Inc. v. Asian Journal Publs., Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999).

The three EZEKIEL marks which Plaintiff claims it owns and Defendant has infringed are the plain block letter version and two stylized versions. Defendant vigorously challenges Plaintiff's claim of ownership to these marks. Defendant argues that "Plaintiff ignored and certainly has not met" the requirements to establish a protectable mark. (Opposition 12:12-15.) While Plaintiff did not explicitly discuss the validity of the three marks in its Motion, the "Factual Background" section of that Motion addresses relevant factors including the duration and extent of the mark's use, promotion of the mark, and resulting sales. (Motion 1-5.)

### 1.1.1.1      Validity of the Plain EZEKIEL Mark

Defendant first challenges Plaintiff's claim that it owns a trademark in the plain, block letter version of EZEKIEL. (Opposition 12:18-26.) Unlike the stylized versions, the plain EZEKIEL mark is not federally registered, and has not been since it was canceled in February 2002. (Gutierrez Decl. Ex. D.) Without federal registration, Plaintiff is not entitled to a presumption of validity on the mark, and bears the burden to prove common law rights to it. To

establish protectability of its unregistered plain EZEKIEL mark, Plaintiff must show that either (1) the mark is inherently distinctive, or (2) the mark has acquired secondary meaning.  *See Disc Golf Assoc., Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1005 (9th Cir. 1998); *see also Glow Indus. v. Lopez*, 252 F. Supp. 2d 962, 977.  If a term is either "suggestive" or "arbitrary or fanciful," it will be considered inherently distinctive.  *See Japan Telecom, Inc. v. Japan Telecom Amer. Inc.*, 287 F.3d 866, 872 (9th Cir. 2002) (noting that such terms are protectable "without a showing of secondary meaning").  A suggestive mark does not describe the product's features but suggests them, thus requiring "multi-stage reasoning to understand the mark's significance." *See Kendall Jackson Winery v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998). Arbitrary marks are terms which are commonly used in the English language but have no relevance to the features of the product, while a fanciful mark is a "made-up" term coined expressly for the purpose of functioning as a trademark.  *Id*.  If an unregistered mark is not inherently distinctive, it may still be protectable if it has achieved secondary meaning.

While EZEKIEL is arguably arbitrary as applied to clothing and apparel,  Defendant argues that Plaintiff must prove secondary meaning for the EZEKIEL mark because it is a personal name.  (Opposition 13:4-8.)  In response to Defendant's contention that Plaintiff's use of EZEKIEL is descriptive and thus requires a showing of secondary meaning, Plaintiff argues that because its mark has no connection to any particular person, secondary meaning is not required.  (Reply 5:16-6:10.)  Under the traditional rule, "[p]ersonal names used as trademarks are generally treated as descriptive terms, since a name might be a convenient description of the fact that the individual was affiliated" with the firm producing the goods.  *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 583 (2d Cir. 1990).  Contrary to Plaintiff's position, "[i]t makes no difference whether or not a person with the name the company claims as a protectable mark is in fact associated with the business."  2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 13.2 (2007); *see also 815 Tonawanda Street Corp. v. Fay's Drug Co.*, 842 F.2d 643 (2d Cir. 1988) (holding that plaintiff was required to prove secondary meaning of the personal name "Fay" "even though there was no person named Fay" associated with the company).  The critical question is not whether the name is in fact the personal name of a

individual associated with the business, but instead whether the public is likely to perceive it as such.  The Court thus assumes that "Ezekiel" is not inherently distinctive, and now considers whether Plaintiff's use of the EZEKIEL mark has attained secondary meaning.

Secondary meaning exists where "there is a mental recognition in buyers' and potential buyers' minds that products connected with the [mark] are associated with the same source." *Japan Telecom*, 287 F.3d at 873 (quoting *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 911 (9th Cir. 1995)).  There is no authoritative list of the factors that should be considered in a secondary meaning analysis, but factors relevant to determining the existence of secondary meaning include: (1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive.  *See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985) (citing 1 Gilson, *Trademark Protection & Practice*, § 209[1]).

Here, Plaintiff has presented evidence of extensive marketing and advertising of the EZEKIEL mark.  According to Plaintiff's declarations, since 1996 the EZEKIEL mark has been used in connection with the sale of apparel including t-shirts, sweatshirts, hats, belts, and backpacks.  (De La Pena Decl. ¶ 11.)  Approximately $9 million dollars have been spent on the "product, brand, and image marketing" of the EZEKIEL mark in the past five years alone.  This marketing includes advertisements in magazines with nationwide circulation, as well as "image marketing" campaigns such as sponsorship of surfing and skateboarding athletes and participation in fashion shows and other youth-oriented events.  (Kurtzman Decl. ¶¶ 6-10.) These marketing efforts have allowed the EZEKIEL brand to expand sales to hundreds of stores across the United States, including at least 338 retail stores in California alone.  (*Id*. ¶ 12.) EZEKIEL brand products are also sold on interactive websites maintained by many retailers. (*Id*.)  Plaintiff has presented little direct evidence of consumers' association of the EZEKIEL mark with a single source, but "circumstantial evidence can be sufficient to meet a party's burden of proof," and "in a trademark case, circumstantial evidence may be all that is available

1    to establish secondary meaning." *Heartland Bank v. Heartland Home Fin., Inc.*, 335 F.3d 810,

2    820 (8th Cir. 2003).  In the absence of direct proof, courts must draw inferences of secondary

3    meaning from circumstantial evidence.  *Id.* (citing *President & Trustees of Colby College v.*

4    *Colby College-New Hampshire*, 508 F.2d 804 (1st Cir. 1975) (noting that the normal

5    consequences of substantial publicity may be inferred).  On the basis of the circumstantial

6    evidence presented by Plaintiff, the Court finds that customers associate the EZEKIEL mark

7    with a single commercial source.  As to this Motion, the Court thus finds that Plaintiff will likely

8    establish that the EZEKIEL mark has achieved secondary meaning.

9

10                   1.1.1.2          Validity of the Stylized EZEKIEL Marks

11

12           In contrast to the unregistered plain EZEKIEL mark, Plaintiff's two stylized EZEKIEL

13   marks are registered with the PTO.  The stylized versions of EZEKIEL are recognizable for their

14   use of numbers in place of letters, using a backwards "3" in place of the letter "E", the number

15   "2" in place of the letter "Z", the number "1" in place of the letter "I", and inversion of the

16   number "7" to resemble the letter "L."  (Appendix Exhs. A-B.)  Acknowledging that Plaintiff's

17   registered marks are entitled to a presumption of validity, Defendant seeks to rebut this

18   presumption by showing abandonment and fraud.  (Opposition 16:12-16.)

19           A mark is abandoned when "its use has been discontinued with intent not to resume such

20   use." 15 U.S.C. § 1527.  "Use" of a mark refers to its bona fide use in the ordinary course of

21   trade, and non-use for three consecutive years is prima facie evidence that a mark has been

22   abandoned. *Id.* Defendant contends that Plaintiff has not used either of its stylized marks for

23   over three years. (Opposition 16:22-17:9.)  After reviewing the record, the Court disagrees with

24   Defendant and for purposes of this Motion finds that Plaintiff has not abandoned the stylized

25   EZEKIEL marks.  Plaintiff's continued use of the marks is evidence both by the Fall 2005

26   catalogue submitted with the original Motion, (Appendix Exh. F), and the Spring 2006 catalogue

27   submitted with the Reply.  (Supplement to Appendix Exh. U.)  These catalogues show ongoing

28   use of the two stylized EZEKIEL marks in connection with the sale of apparel.

Defendant also argues that Plaintiff's stylized EZEKIEL marks should be considered invalid because they were fraudulently obtained. (Opposition 17:12-22.) Cancellation of registration on the basis of fraud requires a showing that the applicant "knowingly [made] false, material representations of fact in connection with an application." *Metro Traffic Control v. Shadow Network*, 104 F.3d 336, 340 (Fed. Cir. 1997); *see also L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 1351 (Fed. Cir. 1999). "A party seeking cancellation for fraudulent procurement must prove the alleged fraud by clear and convincing evidence." *Metro Traffic Control*, 104 F.3d at 340.

According to Defendant, the applications for registration of these marks fraudulently represented "that the marks were in use for all the goods stated in the applications," including dresses, skirts, coveralls, and socks, when in fact the mark was not at that time used in connection with all those goods. (*Id.*) Plaintiff responds by pointing to evidence that it has marketed a broad range of products with the EZEKIEL mark, and noting that at trial Defendant will have the difficult task of proving fraud "by clear and convincing evidence." (Reply 2:17-22.) Plaintiff also correctly points out that even if the registered marks were cancelled, Plaintiff could still pursue its trademark infringement claims on the basis of common law rights. *See Duffy-Mott Co. v. Cumberland Packing Co.*, 424 F.2d 1095, 1100 (C.C.P.A. 1970); *see also Standard Knitting, Ltd. v. Toyota Jidosha Kabushiki Kaisha*, 77 U.S.P.Q. 2d 1917 (T.T.A.B. 2006). The Court agrees with Plaintiff that Defendant's theory of fraud fails to cast sufficient doubt on Plaintiff's ability to prevail on the merits of this case.

### 1.1.1.3     Conclusion

The first requirement of a trademark infringement claim is a showing of a plaintiff's ownership in a protectable mark. *See KP Permanent Make-Up, Inc.*, 543 U.S. at 117. The Court concludes that (1) regarding the unregistered plain EZEKIEL mark, Plaintiff is likely to establish that the mark has achieved secondary meaning and is thus likely to establish a protectable interest in the mark, and (2) regarding the two registered and stylized EZEKIEL marks, Plaintiff

1    is likely to establish a protectable interest despite Defendant's arguments of fraud and

2    abandonment.

3

4              1.1.2   Likelihood of Confusion

5

6              The second required element of a trademark infringement claim is a showing of

7    likelihood of confusion.  A likelihood of confusion exists "when consumers are likely to assume

8    that a product or service is associated with a source other than its actual source because of

9    similarities between the two sources' marks or marketing techniques."  *Nutri/System, Inc. v.*

10   *Con-Stain Indus., Inc.*, 809 F.2d 601, 604 (9th Cir. 1987).  In *AMF Inc. v. Sleekcraft Boats*, 599

11   F.2d 341 (9th Cir. 1979), the Ninth Circuit listed eight factors to be considered as part of the

12   consumer confusion inquiry.  *Id*. at 348-349.  The *Sleekcraft* factors are: (1) the similarity of the

13   marks; (2) the strength of the plaintiff's mark; (3) the relatedness or proximity of the goods; (4)

14   the marketing channels used by each party; (5) the degree of care likely to be exercised by the

15   purchaser; (6) the defendant's intent in selecting the mark; (7) evidence of actual confusion; and

16   (8) the likelihood of expansion of the parties product lines.  *Id*.

17              Defendant does not contest Plaintiff's claim that use of the term "Ezekiel" on products

18   sold through its website is likely to cause consumer confusion, and after performing its own

19   analysis the Court concludes that such argument would be futile.  The term "Ezekiel" as featured

20   on products sold through Defendant's website is identical to the EZEKIEL mark in "appearance,

21   sound and meaning," and any additional terms used on Defendant's products are outweighed by

22   the similarities.  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000)

23   ("similarities weighed more heavily than differences.").  Not only are the marks identical, but the

24   fact that they are used by both Plaintiff and Defendant to adorn apparel, especially t-shirts and

25   sweatshirts sold for comparable prices, greatly increases the likelihood of confusion.  *See*

26   *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993) (finding that where the

27   goods bearing the two marks at issue are related, there is a heightened concern of consumer

28   confusion); *see also Sleekcraft,* 599 F.2d at 350 (holding that where goods are similar in use and

1    function, less similarity between the marks is required to support a finding of likelihood of

2    confusion).  Because the goods are relatively low-priced (generally in the $20 to $40 range), it is

3    assumed that consumers will not exercise a high degree of care in their purchases and will be

4    more susceptible to confusion.  *See Official Airline Guides, Inc.*, 6 F.3d at 1393 ("It is assumed

5    that buyers will exercise greater car in their purchases of expensive goods"); *see also E. & J.*

6    *Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992).

7            On the basis of this analysis, the Court agrees with Plaintiff that the most important

8    *Sleekcraft* factors support a finding of a likelihood of confusion between Plaintiff's EZEKIEL

9    mark and Defendant's allegedly infringing use.  (Motion 12:8-26.)  Because Plaintiff has

10   established (1) the existence of a protectable mark, and (2) a likelihood of confusion, the Court

11   finds that Plaintiff is likely to prevail on the merits of the trademark infringement claim.

12   Plaintiff's likelihood of success on the trademark infringement claim is a sufficient basis for

13   preliminary injunction, and the Court therefore finds it unnecessary to address the trademark

14   dilution claim.

15

16            **1.2      Affirmative Defense of Fair Use**

17

18            To oppose Plaintiff's trademark infringement claim, Defendant raises the affirmative

19   defense of fair use, which is available to a party whose "use of the name, term, or device charged

20   to be an infringement is a use, otherwise than as a mark, . . . of a term or device which is

21   descriptive of and used fairly and in good faith only to describe the goods or services of such

22   party, or their geographic origin . . . ."  15 U.S.C. § 1115(b)(4).  A defendant claiming fair use

23   must thus establish that the term "is used descriptively, not as a mark, fairly, and in good faith."

24   *KP Permanent Make-up, Inc.*, 543 U.S. at 123.  The policy behind the fair use doctrine in the

25   trademark context is that the holder of a descriptive mark has no legal right to exclude others

26   from using the term in its primary and descriptive sense.  *See Zatarains, Inc. v. Oak Grove*

27   *Smokehouse, Inc.*, 698 F.2d 786, 791 (5th Cir. 1983) (*overruled in part on other grounds by KP*

28   *Permanent Make-up, Inc.*, 543 U.S. 111).  "Consequently, anyone is free to use the term in its

1  primary, descriptive sense so long as such use does not lead to customer confusion as to the

2  source of the goods or services." *Id*.  Considering this legal landscape, the question for the Court

3  is whether the term "Ezekiel" on clothing sold through Defendant's website is used in the

4  primary and descriptive sense of that term and thus protected as fair use, or whether it is

5  improperly used to identify the source of Defendant's products. *See Cosmetically Sealed Indus.*

6  *v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 29 (2d Cir. 1997) ("The defense permits others to

7  use protected marks in descriptive ways, but not as marks identifying their own products.").

8       Defendant argues that the use of the term "Ezekiel" on its website constitutes fair use

9  because "[t]he use of the name Ezekiel on the [Defendant's] website is to identify a person's

10  given name or to refer to a biblical character or reference."  (Opposition 21:26-27.)  To support

11  this claim, Defendant contends that "the majority of uses of the name Ezekiel by [Defendant's]

12  shopkeepers are in 'name shops', where any name can be plugged into a design predetermined

13  by the shopkeeper."  (*Id*. at 21:28-22:2.)  The crux of Defendant's argument is that customers

14  purchase these "Ezekiel" products because they understand the term as creating an association

15  with a specific individual, and not because they view the mark as identifying the source of the

16  goods.

17       Plaintiff contests Defendant's characterization of the purchases that occur on its website.

18  According to Plaintiff, a consumer arriving at Defendant's main web page is able to conduct an

19  immediate search for products bearing the term "Ezekiel," and is directed to a page entitled

20  "Ezekiel T-Shirts and Gifts."  (Reply 8:19-24.)  From the "Ezekiel T-Shirts and Gifts" page, a

21  consumer can view and purchase various products featuring the term "Ezekiel."  Plaintiff argues

22  that by offering ready-made products emblazoned with the term "Ezekiel," Defendant is

23  improperly using the mark in a manner that is "not descriptive of anything, much less a religious

24  figure or one's given name."  (*Id*. at 10:1-7.)  The Court agrees with Plaintiff that "the relevant

25  marketplace begins with [the] homepage at www.cafepress.com," and Defendant's "name shop"

26  theory is therefore not persuasive.  (*Id*. at 9:19-20.)

27       Plaintiff further argues that the high likelihood of consumer confusion favors a finding

28  that Defendant's use of the term "Ezekiel" is not fair.  (*Id*. at 7:23-8:5.)  "[M]ere risk of

1   confusion will not rule out fair use," and the fair use defense does not place an independent

2   burden on the defendant to negate the likelihood of confusion.  *KP Permanent Make-up, Inc.*,

3   543 U.S. at 123.  But the likelihood of consumer confusion may still be relevant to assessing

4   whether a defendant's use is objectively fair.  *Id.* (observing that at least two Courts of Appeals

5   have found it relevant to consider the scope of consumer confusion in assessing a defendant's

6   claim of fair use).  As the Court discussed in Section 1.1.2, Defendant's use of a mark identical

7   to Plaintiff's EZEKIEL mark, and in connection with same type of clothing goods as those sold

8   by Plaintiff, is likely to cause consumer confusion.  The products available on Defendant's

9   website feature the term "Ezekiel" in a variety of different styles, colors, and arrangements, but

10  at least some of these products are highly similar to those marketed by Plaintiff.  For example,

11  the cursive script and reverse image styles found on Defendant's website are very similar to

12  Plaintiff's uses of the EZEKIEL mark.  (*Compare* Appendix Exhs. K, N, P, Q *with* Appendix

13  Exhs. E, U.)

14      Because Plaintiff convincingly argues that Defendant is not using "Ezekiel" in its primary

15  or descriptive sense, and because Defendant's fair use claim is called into question by the high

16  likelihood of consumer confusion, Plaintiff has established that it is likely to prevail against the

17  affirmative defense of fair use.

18

19  **2.      POSSIBILITY OF IRREPARABLE HARM**

20

21      To qualify for a preliminary injunction, the moving party must show either (1) a

22  combination of probable success on the merits and the possibility of irreparable harm, or (2) the

23  existence of serious questions going to the merits of the claim and the balance of hardships

24  tipping in its favor.  *See, e.g., Vision Sports, Inc. v. Melville Corp*, 888 F.2d 609, 612 (9th Cir.

25  1989).  In trademark infringement or unfair competition actions, once the plaintiff establishes a

26  likelihood of confusion it is ordinarily presumed that the plaintiff will suffer irreparable harm if

27  injunctive relief is not granted.  *See Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F.

28  Supp. 2d 995, 1007 (C.D. Cal. 2007) (quoting *Vision Sports, Inc.*, 888 F.2d at 612 n.3); *see also*

1   *Hasbro, Inc., v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988) ("[S]howing of likelihood of

2   confusion establishes both a likelihood of success on the merits and irreparable harm."). The

3   Court has found that Plaintiff is likely to prevail on the merits of its trademark infringement

4   claim, and irreparable harm is thus presumed.

5          Defendant seeks to rebut this presumption by arguing that Plaintiff's claim of irreparable

6   harm "is belied by its dilatory behavior" in bringing this Motion. (Opposition 22:24-23:4.) To

7   support this contention, Defendant argues that Plaintiff waited three months after settlement

8   talks reached a stalemate before filing this Motion, thus indicating a lack of urgency. (*Id*. at

9   23:5-24.) Plaintiff's response is that when settlement negotiations stalled, and upon discovering

10  that Defendant's use of the EZEKIEL mark was expanding, Plaintiff worked diligently to gather

11  the evidence necessary to bring this Motion. (Reply 11:12-17.) Plaintiff also disagrees with

12  Defendant's account of the settlement negotiations, claiming that it was Defendant who initially

13  delayed the progress of those talks. (*Id*. at 11:4-11.) With the parties' disputes regarding the

14  dynamics of settlement talks and the impact of those talks on the timing of Plaintiff's filing of

15  this Motion, the Court does not find that Defendant has either rebutted or rendered inoperative

16  the presumption of irreparable harm.

17         Defendant also argues that "even if Plaintiff had met its burden of proof to show that it

18  owns valid protectable marks and irreparable harm . . . the balance of hardships in this instance

19  tips sharply in [Defendant's] favor." (Opposition 24:17-20.) Defendant's argument misstates

20  the relevant law. A plaintiff can qualify for preliminary injunction *either* by showing likelihood

21  of success merits and possibility of irreparable harm, *or* by showing the existence of serious

22  questions on the merits and that a balance of the hardships tips in its favor. *See Vision Sports,*

23  *Inc.*, 888 F.2d at 612; *see also Dep Corp. v. Opti-Ray, Inc.*, 768 F. Supp. 710, 713 (9th Cir.

24  1991). Because Plaintiff has shown that it is likely to succeed on the merits and that there is a

25  possibility of irreparable harm, it is not required to make the additional showing that the balance

26  of hardships tips in its favor.

27

28

**<u>DISPOSITION</u>**

A preliminary injunction is a drastic and extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). For the reasons discussed here, the Court finds that Plaintiff has met this burden and its Motion for Preliminary Injunction is GRANTED. While the Motion is granted, the Court agrees with Defendant that Plaintiff's proposed preliminary injunction order is overly broad. Within five days of this Order, both parties may submit proposed preliminary injunction orders consistent with the Court's ruling here. The Court will be inclined, if possible, to select the more reasonable of the two proposals in its entirety.

Federal Rule of Civil Procedure 65(c) requires a court issuing a preliminary injunction to set a security bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Bond in this case is set at $1 million.

IT IS SO ORDERED.

DATED: February 25, 2008

_____
Andrew J. Guilford
United States District Judge

15